In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-3062, 10-3068

BCS SERVICES, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

HEARTWOOD 88, LLC, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 05 C 4095, 07 C 1367—**James F. Holderman**, *Chief Judge*.

ARGUED FEBRUARY 24, 2011—DECIDED MARCH 24, 2011

Before BAUER, POSNER, and MANION, *Circuit Judges*.

POSNER, *Circuit Judge*. These consolidated appeals are from judgments in two suits seeking damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, for mail fraud. (The suits are materially identical so we'll pretend that they're one case and that the two appeals are also one.) The district court dismissed the case more than five years ago on the ground that the plaintiffs lacked standing to sue because they hadn't relied on the fraud

and therefore "at best were indirect victims of the alleged fraud." *Phoenix Bond & Indemnity Co. v. Bridge*, 2005 WL 3527232, at *5 (N.D. Ill. Dec. 21, 2005). We reversed, 477 F.3d 928 (7th Cir. 2007), and the Supreme Court affirmed our decision. 553 U.S. 639 (2008). The case returned to the district court, which has again dismissed, this time by granting summary judgment for the defendants on the ground that the plaintiffs can't prove that the fraud was a "proximate cause" of their alleged losses. Although that sounds like a different ground from the first dismissal, it's actually pretty close. The district judge's second opinion states that "any number of reasons wholly unrelated to Defendants' alleged violations of the SSBR [the rule that the defendants are alleged to have violated to effectuate the fraud] could impact the value of Plaintiffs' lien portfolios: [among others,] the Treasurer's determination of whether to bar Defendants from the sales, and if so for how long; the actions of third-party bidders, including how quickly they bid; the auctioneers' subjective awarding of liens; and the property owners' decision to redeem the property." 2010 WL 3526469, at *14 (N.D. Ill. Sept. 1, 2010). The only significant difference between the two opinions is that in round one the judge dismissed the suit because the plaintiffs were (he ruled) only indirect victims of the fraud and in round two he granted summary judgment for the defendants because he thought that although we and the Supreme Court had held that the plaintiffs were direct victims, they had not been injured directly; the causal link between the fraud and the injury was "tenuous." *Id*. at *13. The case is again before us on appeal by the plaintiffs.

When an owner of property in Cook County, Illinois, fails to pay his property tax on time, the amount of tax that is due (which is to say past due) becomes a lien on the property. The county sells its tax liens at auctions. The bids at the auctions are stated as percentages of the taxes past due. The percentage, multiplied by the amount of past-due taxes (plus any interest due on them, which we'll ignore), is the "penalty" that the bidder demands from the owner to clear the lien. The winning bidder is the bidder who bids (that is, is willing to accept) the lowest penalty—often zero percent of the tax due, meaning that the bidder is just offering to pay the County the past-due taxes and receive in exchange the lien. The taxpayer has two to three years in which to erase the lien by paying the winner of the auction (and hence new owner of the lien) the past-due taxes that the winner had paid the County, plus the penalty (if any). If the taxpayer fails to redeem by paying what he owes, the purchaser of the lien can obtain a tax deed to the property and thus become the property's owner. In deciding which tax liens being auctioned to bid for, and how much to bid (whether a zero-percent penalty, or a 5 percent penalty, or any other percent), the would-be tax lienor is looking for properties, (1) whose owners are unlikely to redeem them by paying the past-due taxes during the redemption period and (2) are worth more than the past-due taxes on them.

The auctions are conducted in rapid-fire fashion in a room in which the bidders bid by raising a card with their bidder ID number and shouting out their penalty percentage (usually "zero!"). Almost 85 percent of the

winning bids are at the zero-percent penalty level, which implies that most bids are identical bids (identical zero-percent bids). How is the auctioneer to pick the winner in such a case? It's difficult! Suppose fifteen bidders bid zero percent on a particular lien being auctioned. The bids being identical, the auctioneer will try to award the lien to the bidder who raised his hand first. But if many bidders raised their hands as soon as the bidding began, the auctioneer may find it impossible to determine who raised his hand first, in which event he'll probably pick one of the zero bidders at random.

Bidders use a variety of tactics to attract the auctioneer's attention, such as by lobbying to be given a seat closer to the auctioneer so that the bidder's raised hand is more likely to be noticed first. A few of the auctioneers claim improbably that they can always tell who raised his or her hand first, no matter how many hands shoot up all over the room, while others say that when there are multiple identical bidders they try to allocate the awards "fairly," whatever that means—probably it just means not awarding too many liens to the same bidder at the same auction. So on the one hand liens are not awarded on a strict rotational basis but on the other hand a jury could find that most zero-percent awards are the random product of guesswork.

The County's rules permit only one agent of a potential buyer, or of a group of cooperating buyers ("related entities"), to bid. Otherwise a potential buyer could increase the likelihood of winning by packing the room. Suppose that a potential buyer, call him "BidCo," was

represented by 10 persons—but the auctioneer thought they were 10 different bidders—and all the other potential buyers were represented by one person each, as they're supposed to be. BidCo would have a big advantage. If for example there were 21 potential buyers and all bid zero percent for a particular tax lien, 30 hands would be shooting up but 10 of them would belong to one buyer. Whether the auctioneer was able to pick the bidder who raised his hand first, or as is more likely there was simply a distribution of hand-raising speeds and well-sited seats, the buyer who had 10 hands in the room would have an advantage over each of the other 20 potential buyers. He would be likelier to have some fast hands and some ringside seats, as well as having an advantage just by virtue of the number of hands, when the auctioneer threw up *his* hands and awarded liens randomly among the zero-percent bidders, or tried to rotate them among the bidders in the interest of "fairness." If BidCo's violation of the prohibition against related entities' multiple bidding were concealed, so that his scheme operated as a fraud on the one-armed bidders, BidCo would have engaged in a pattern of mail fraud in violation of RICO because, as we explained in our first opinion, "the tax-sale process employs the mail—perhaps to send affidavits, and certainly to send notices to owners that the liens have been sold and the taxes must be paid or the property forfeited," and "any fraud that affects which bidders obtain how many liens is 'mail fraud.'" 477 F.3d at 930.

The case is a little more complicated than we've let on so far because three separate groups (whose members

are the defendants) of allegedly related entities are accused of the fraud. As a result, instead of having just three arms the defendants had between 11 and 39, with up to 13 being used in a given auction session during the six years in which the conspiracies are alleged to have been operating. In each of the three conspiracies a kingpin financed the bidding activity of the group's members and when the kingpin agent's bidder would win a lien the kingpin would buy it from him.

For purposes of this appeal (only), the defendants concede that they committed a fraud actionable under RICO if the plaintiffs can prove both proximate cause and damages. The district judge granted summary judgment for the defendants because he thought that the plaintiffs—two of the one-armed bidders at the auctions—had failed to produce evidence that the fraud was a proximate cause of their losing any of the bidding rounds.

The injection of the term "proximate cause" into this litigation has muddied the waters. It was injected for no better reason—and it is not a good reason—than that it has figured in several RICO cases decided recently by the Supreme Court, none comparable to this case.

You cannot obtain damages for fraud or any other tort, whether you are litigating under common law or the RICO statute, without proving that the fraud caused a loss to you, such as a financial loss, for which damages can be awarded. The problem is that there may be multiple causes of your loss, obscuring the effect of the defendant's wrongful act. Sometimes the causes are

joint. For example, a passerby drops a match in a puddle of oil created by a leak from a tanker truck, and the oil explodes. *HK Systems, Inc. v. Eaton Corp.*, 553 F.3d 1086, 1090 (7th Cir. 2009); *Leposki v. Railway Express Agency, Inc.*, 297 F.2d 849 (3d Cir. 1962); *Overseas Tankship Ltd. v. Miller Steamship Co.*, [1967] 1 A.C. 617 (P.C.) (*The Wagon Mound No. 2*). Without both match and leak—hazards created by separate persons—there would be no explosion and so no harm. Who should be liable?

Sometimes causes are alternative: a person is stabbed by two knife-wielding assailants, and either stab wound would have been fatal. Should both be excused from liability because neither was necessary for the injury to occur? *United States v. Johnson*, 380 F.3d 1013, 1016 (7th Cir. 2004). And likewise when each of two wrongdoers could have caused the plaintiff's injury and it is unclear which did and each points at the other and says let me off because the other guy may have done it. *Summers v. Tice*, 199 P.2d 1 (Cal. 1948).

Or sometimes—and here is where the doctrine of *proximate* cause does its work—too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur—so many unexpected things that the defendant couldn't have foreseen the effect of his wrongdoing and therefore couldn't have been influenced, in deciding how much care to employ in the activity that produced the wrongful act, by the prospect of inflicting such an injury as occurred. See, e.g., *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 118 and n. 7 (1963); *HK Systems, Inc. v.*

*Eaton Corp., supra*, 553 F.3d at 1090. And then holding him liable would have little effect in deterring wrongful conduct.

A better name for the application of the doctrine of proximate cause in such a case would be "for want of a nail the kingdom was lost":

> *For want of a nail the shoe was lost.*
> *For want of a shoe the horse was lost.*
> *For want of a horse the rider was lost.*
> *For want of a rider the battle was lost.*
> *For want of a battle the kingdom was lost.*
> *And all for the want of a horseshoe nail.*

Suppose the blacksmith had been negligent in failing to fasten the horseshoe to the horse's hoof with enough nails to hold it securely. His negligence was therefore a cause of the loss of the kingdom because it led to the loss of one of the riders, which led in turn to the defeat of the king's army. (And not just any rider: Shakespeare in *Richard III* attributed Richard's loss of the Battle of Bosworth Field, and thus of his life and his crown, to his falling off his horse because the horse was not properly shod; in fact the horse had gotten mired in the mud of the field, for reasons unrelated to his shoe.) But had the blacksmith been told ahead of time that if he didn't fasten the shoe properly he could be responsible for the end of the York dynasty, the warning would not have induced him to use additional care in fastening the shoe to the hoof because the probability that his negligence would have such a consequence would have seemed slight. An injury will sometimes

have a cascading effect that no potential injurer could calculate in deciding how carefully to act. The effect is clear in hindsight—but only in hindsight.

A more realistic modern example would be a suit against the defendants in our case by someone who lost his job because the one-armed bidder who employed him didn't win enough tax liens at the auctions to be able to afford to keep him on its payroll. The employee would have suffered a loss caused by the defendants (assuming their fraud was indeed what impelled the one-armed bidder to reduce his staff), but as in a literal want-of-a-nail case their conduct would not be deemed a "proximate cause" of the employee's loss of his job, and so his suit would fail. *Evans v. City of Chicago*, 434 F.3d 916, 926-29 (7th Cir. 2006); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1335-36 (7th Cir. 1989); *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990). Similarly, a creditor who suffers a default because his debtor was injured by a tort cannot sue the tortfeasor for the damages resulting from the default. *In re Teknek, LLC*, 563 F.3d 639, 645-50 (7th Cir. 2009); *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir. 1987). If the creditor could sue, why not the creditor's son who had to borrow for his tuition because his father could no longer afford to pay it? Or the college, if the son was turned down for a loan and had to withdraw? Or the bookstore at which the son would have bought the books for his courses had he remained a student? Or the publisher of the books sold

by the bookstore? Or the companies that sold paper to the publishers? Or the authors?

Notice how allowing any of those secondary or tertiary or even more remote tort victims to obtain a judgment would dim the primary victim's prospects of obtaining redress for *his* injury. Any tortfeasor's resources are limited. The more plaintiffs there are clamoring for relief, the less in damages each one may be able to recover. That is a further reason, along with a desire to limit the amount of litigation arising from a single wrongful act and to confine tort liability to foreseeable (as distinct from so improbable as to be unforeseeable) consequences, for limiting the right to relief to the initial victims of the wrong, as in *James Cape & Sons Co. v. PCC Construction Co.*, 453 F.3d 396 (7th Cir. 2006), on which our defendants rely. The plaintiff, a competing bidder as in this case (hence the defendants' reliance), sued the winning bidders on the ground that they had agreed among themselves not to bid less on state construction contracts than an agreed amount, so as to maximize their profits from a winning bid. (Probably they also agreed to rotate submission of the winning bid among the members of the group, so that each would share in the profit opportunity that the conspiracy created.) The primary victim was the State of Wisconsin, which had solicited the bids; it had paid more for the construction contracts obtained by the winning bidders than if there had been no conspiracy. The plaintiff, in contrast, probably hadn't been injured at all and might well have benefited from the conspiracy because the higher his competitors' bids

the likelier he was to be the low bidder and win the contract. See *Phoenix Bond & Indemnity Co. v. Bridge*, *supra*, 477 F.3d at 932.

There is still another reason for worrying about imposing liability when the defendant's conduct and the plaintiff's injury are separated by intermediate pairs of cause and effect. The horseshoe was missing a nail, yes, but it might have fallen off anyway, in the heat of battle; and how likely is it that one downed rider (unless it really was the king) made the difference between victory and defeat? (And mightn't he have fallen anyway?) And in the employment case, might not other factors have doomed the employee's job? There is plenty of employee turnover even when the employer is not a victim of fraud.

The "indirect purchaser" rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-36 (1977), is a notable example of the evidentiary concerns that lead courts to disregard secondary causal relations. Suppose competing manufacturers conspire to raise the prices of their products, in violation of federal antitrust law. The buyers—suppose they're retail dealers—pay the higher prices, but turn around and raise the prices they charge their purchasers, the consumers, in an effort to minimize the impact on their profits of the manufacturers' higher prices. The injury caused by the price-fixing conspiracy is likely to be shared between the direct purchasers from the conspirators and the indirect ones (the consumers in the example). But to determine the relative hurt would require a complex inquiry, and so the indirect purchasers, though harmed, are not allowed to

sue. This may seem a harsh result, but is mitigated by the fact that the antitrust violators are not allowed to offset against their liability the amount of loss that the direct purchasers, the dealers, who are allowed to sue, were able to pass on to their customers in the form of higher prices. By allowing a windfall to the direct purchasers—they can sue for the full markup over the competitive price for the manufacturers' product even if they passed on much of the higher price to consumers—the law gives them a greater incentive to sue, which should increase deterrence, which should benefit the indirect purchasers indirectly.

The doctrine of proximate cause thus protects the ability of primary victims of wrongful conduct to obtain compensation; simplifies litigation; recognizes the limitations of deterrence (unforeseeable consequences of a person's acts will not influence his decision on how scrupulously to comply with the law); and eliminates some actual or possible but probably minor causes as grounds of legal liability. All this is true in RICO cases just as in other tort cases whether common law or statutory. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992); *HK Systems, Inc. v. Eaton Corp.*, *supra*, 553 F.3d at 1090.

The doctrine has no application to this case, at least on the record compiled to date. The defendants' aim was to obtain a larger share of tax liens. The larger share came from other bidders, the bidders we're calling one-armed. The *only* injury was to those bidders, who included the two plaintiffs. The County's rule limiting related entities

to a single bidding agent was intended for the benefit of unrelated bidders rather than for its own benefit (except very indirectly, insofar as the rule encouraged bidding). It was a matter of indifference to the County who bought the tax liens, for whoever it was would have to pay the County the taxes on the properties subject to the liens. The one-armed bidders were thus the only victims of the fraud—and the plaintiffs were one-armed bidders.

The defendants stole a business opportunity from the plaintiffs by flooding the auction room with raised hands that shouldn't have been there. The only inter-mediate cause and effect pair was the raising of hands (cause) and the auctioneer's determination of the winning bid (effect), and this pair doesn't weaken the inference that by having more hands in the air the de-fendants stole tax liens from the other bidders. That would be obvious if the auctioneers awarded tax liens in identical-bid cases on a strictly rotational basis, as the Supreme Court assumed when, in its opinion affirming our previous decision, it characterized the plaintiffs' theory of causation as "straightforward." 553 U.S. at 647; see also *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 992 (2010). Straightforward it was and after discovery straightforward it remains because, as we shall see, random awards—the character of many of the awards in identical zero-percent bidding—are similar to awards made on a strictly rotational basis.

The defendants argue that if there is *any* possible slip 'twixt cup and lips (to continue law by proverb), the

plaintiff must prove that it did not occur. Not so. The plaintiff doesn't have to prove a series of negatives; he doesn't have to "'offer evidence which positively exclude[s] every other possible cause of the accident.'" *Carlson v. Chisholm-Moore Hoist Corp.*, 281 F.2d 766, 770 (2d Cir. 1960) (Friendly, J.), quoting *Rosenberg v. Schwartz*, 183 N.E. 282, 283 (N.Y. 1932). In technical legal terms the burden of proving an "intervening cause"—something which snaps the "causal chain" (that is, operates as a "superseding cause," wiping out the defendant's liability, see *Restatement (Second) of Torts* § 440 (1965)) that connects the wrongful act to the defendant's injury—is on the defendant. *Roberts v. Printup*, 595 F.3d 1181, 1189-90 (10th Cir. 2010).

The district judge required the plaintiffs to prove the nonexistence of potential superseding causes rather than requiring the defendants to present evidence to support their conjectured superseding causes. He said that otherwise "a jury would be forced to speculate as to whether Defendants violating the [related-entities rule] would [if the Treasurer, who administers the tax-lien auctions, had learned of the violation before or during the complaint period] have been permanently barred from the County tax lien sales, excluded for only a day or a year, or faced some other unknown consequence." 2010 WL 3526469, at *8. This possibility would cancel the effect of the defendants' fraud on the number of liens won by the plaintiffs only if whatever sanction the Treasurer imposed would have allowed the defendants to continue violating the related-entities rule: for example if she would have barred them from bidding

for one day but allow them to resume their collusive activity the day after. That is beyond unlikely, and hardly "evidence" of a superseding cause that the plaintiffs would have to rebut in order to withstand summary judgment. And so the plaintiffs can't be faulted, as the defendants argue, for having failed to depose the Treasurer—the defendants, who had the burden of proving that the Treasurer would have let them off scot free, didn't do so either. Had the Treasurer forced the defendants to stop colluding in violation of the related-entities rule (and in violation as well of the oath they had sworn, when they signed up to bid in the auction, to comply with the related-entities rule), the one-armed bidders would have obtained more liens than they did.

The defendants present other implausible speculations concerning possible superseding causes, and demand that the plaintiffs refute them. They argue that the "plaintiffs' failure to obtain more liens than they actually won could have been the result of competition from third-party bidders, the auctioneers' subjective perceptions, or failures of Plaintiffs' bidders to keep pace with the auction and to bid on liens they may have intended to bid on." The defendants note that one of the plaintiffs complained to the Treasurer's Office that it was being "relegated" to "seats in the back of the room where it was difficult for the bidders to be recognized, and the auctioneers to view them" and that a bidder for the other plaintiff admitted that she might have been slower at raising her hand than other bidders on some occasions. But so far as yet appears—for of course there has been no trial—these were isolated instances over the

course of six years. And as for whether the plaintiffs were outbid by bidders who were not members of the conspiracies, this is unlikely since the case is only about identical zero-percent bids (so there are only low bidders, rather than a lowest bid), and the defendants presented no evidence to establish such a superseding cause of the plaintiffs' injury.

The defendants were throwing sand in the district judge's eyes. The object of their conspiracies was to obtain liens that would otherwise go to one-armed bidders—there could be no other reason for wanting to pack the room in violation of the County's rule. The plaintiffs were major bidders. They bid for many thousands of liens. How likely is it that they lost *no* bids to bidders who had 13 arms in the room but should have had only three?

Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation. *Liriano v. Hobart Corp.*, 170 F.3d 264, 271-72 (2d Cir. 1999); *Kingston v. Chicago & N.W. Ry.*, 211 N.W. 913, 915 (Wis. 1927); *Martin v. Herzog*, 126 N.E. 814, 816 (N.Y. 1920) (Cardozo, J.) ("evidence of a collision occurring more than an hour after sundown between a car and an unseen buggy, proceeding without lights, is evidence from which a causal connection may be inferred between the collision and the lack of signals"). The causal relation between a defendant's act and a plaintiff's injury, like that required to establish standing under

Article III of the Constitution, need only be probable. *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998); *MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742, 744-45 (7th Cir. 2007); *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993). Otherwise how could a person obtain a judgment for medical malpractice based on a failure to diagnose a disease that proved fatal but had it been diagnosed earlier *might* have been cured? *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 828-31 and n. 23 (Mass. 2008); *Holton v. Memorial Hospital*, 679 N.E.2d 1202, 1213 and n. 2 (Ill. 1997); *Doll v. Brown*, 75 F.3d 1200, 1205-07 (7th Cir. 1996). And how could four equally qualified employees who were discriminated against when a company made a single promotion obtain any relief? Yet we've held that the plaintiff in such a discrimination case is entitled to damages equal to 25 percent of the pay he would have received had he gotten the promotion. *Biondo v. City of Chicago*, 382 F.3d 680, 688-89 (7th Cir. 2004); see also *Griffin v. Michigan Department of Corrections*, 5 F.3d 186, 189 (6th Cir. 1993). That is the nature of the relief—statistical, probabilistic—sought by the plaintiffs in this case.

We gave our most exotic example of probabilistic injury in *Milam v. Dominick's Finer Foods, Inc.*, 588 F.3d 955, 958 (7th Cir. 2009): "Suppose you're playing roulette on a 37-number wheel (18 red, 18 black, and 1 green) at the Casino de Monte-Carlo, and after you have placed your $1,000 bet on red, which will pay you $2,000 if the ball lands on red, the casino collapses through the negligence of a building contractor, destroying not only the roulette wheel but also your chips, and you cannot get

the money you paid for them back because all the casino's records were destroyed when it collapsed. You've suffered a loss equal to a 48.6 percent chance of winning $2,000. So $972.73 would be your damages." That is the type of probabilistic loss that the plaintiffs claim to have suffered in this case.

If a trier of fact finds causation according to the standard just explained, which requires merely a probability of a harm attributable to the defendant's wrongful act, the only remaining issue is the amount of damages to be awarded to the plaintiff. On that phase of the case the plaintiff has a more relaxed burden of proof than on the issue of causation, especially if as in this case the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages. *J. Truitt Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-66 (1931); *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 657-59 (7th Cir. 2004); *BE&K Construction Co. v. Will & Grundy Counties Building Trades Council*, 156 F.3d 756, 769-70 (7th Cir. 1998); *Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 67 (1st Cir. 1984). "Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification. But the injury itself must be proved in the usual way, without speculation or burden shifting." *Haslund v. Simon Property Group, Inc., supra*, 378 F.3d at 658. (The distinction between proof of cause and proof of damages is also well explained in Justice

Thomas's separate opinion in *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 465-67 (2001).) Even "speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1365 (7th Cir. 1996), quoting *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir. 1986). Otherwise "the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow v. RKO Radio Pictures, Inc., supra*, 327 U.S. at 265.

In this case, for example, the plaintiffs do not have good records of which tax liens they bid for unsuccessfully. The only reason they would have needed such records was to prove damages in a lawsuit. Since they didn't know they were victims of fraud, they had no reason to think they needed good records of their unsuccessful bids—for of what use would such records have been had there been no fraud? The judge missed this point because he confused proof of causation with proof of amount of damages and so denied the plaintiffs the benefit of the easier burden of proving damages than of causation.

The defendants must know they're skating on thin ice. For (to mix our metaphors) they have not put all their eggs in the basket labeled "proximate cause" but instead have also argued that the plaintiffs cannot prove damages and we can therefore affirm on that alternative ground. Given the lightened burden of proof in the damages phase of a tort case, the argument fails. It's true as we just noted that the plaintiffs' records of their unsuccessful bids are poor. The defendants ask us to infer

that maybe the plaintiffs didn't bid on *any* of the tax liens that the defendants bid on. (Another possibility, but the defendants don't argue it, is that with fewer arms in the air, more buyers would be attracted to the auction because their chances of being awarded a tax lien by the auctioneer would have been greater, and perhaps in the end the total number of arms in the air at each auction would have been the same even if there had been no violation of the related-entities rule.) Yet it's undisputed that the two plaintiffs submitted many thousands of zero-percent bids—they presented evidence that they bid on between 72 and 92 percent of the tax liens that were won by the defendants during the complaint period—and ended up with only 7 percent of the 96,000 zero-per-cent awards during the six years in which the alleged conspiracy was in force, while the defendants, who often had more than four times as many arms in the air as they should have had (13 versus three), won a total of 41 percent of the zero-percent liens. It seems highly likely that at least part of this dramatic difference in success was attributable simply to more hands in the air. To the extent that awards of zero-percent bids are distributed randomly among the bidders—and many undoubtedly are—the three defendant groups would be expected to win 50 percent more awards than the two plaintiffs if everyone was playing by the rules, and this would be 10.5 percent of the awards (7 percent plus 3.5 percent)—not 41 percent.

The defendants argued and the district judge appears to have been persuaded that unless the liens had been awarded on a strictly rotational basis when identical bids were submitted, there could be no confidence that

each of the plaintiffs would have obtained a proportionately equal share of the zero-percent liens had the defendants not packed the auction room. This reasoning reflects a misunderstanding of statistical theory. In a large sample, random selection produces with a high degree of confidence (certainly a high enough degree for a damages award in a fraud case) the same proportions as strict rotation would. Suppose an urn contains 1,000 white balls and 1,000 black ones. The urn's owner wants each of two visitors to have 500 of each type of ball. He patiently removes the balls one by one, being careful to give exactly the same number of white and black balls to each visitor. That is strict rotation. But by the time he is halfway through, and each visitor has 250 white balls and 250 black balls, he becomes bored and impatient. So he blindfolds the visitors and tells each to draw the same number of balls from the urn, of course without being able to determine which are white and which black. Hence the remaining 500 white and black balls are distributed randomly between the two visitors, rather than in strict rotation as the first 500 balls were. Yet on average each visitor will end up with the same number of white and black balls, just as when there was strict rotation between white and black. That's just on average; in any actual drawing there is likely to be some deviation from equality. Such a deviation would matter in this case if the victim of a fraud had to prove his loss with mathematical exactitude. He does not.

The statistical evidence in this case would be enough, when combined with evidence also presented by the plaintiffs of the average profit they made on the zero-percent liens that they won, to carry their burden of

proving an amount of damages with sufficient (which is not to say with great) precision to justify an award of that amount. The evidence was summarized in two expert-witness reports that the defendants take a number of potshots at. The criticisms may be substantial, but they are premature because the district judge never ruled on the admissibility of the expert evidence previewed in the reports. On the record as it stands the plaintiffs made a prima facie case of damages in the amount ($5 million before trebling) that they seek, and so the defendants cannot prevail on their alternative, zero-damages defense of the district court's decision without a trial.

So much for the RICO claim. The plaintiffs have a supplemental claim as well, which the district judge also dismissed on summary judgment. The claim is for intentional interference with a business opportunity, in violation of Illinois common law. The judge rejected it on the ground that the plaintiffs "cannot prove that they had an actual expectancy of winning a specific lien." 2010 WL 3526469, at *14. (In rejecting "proximate causation" in regard to the RICO claim, the judge, mistaking the significance of statistical evidence, also fastened on the inability, as he thought, of the plaintiffs to identify "specific liens" that they had failed to win.) It is true that the plaintiff must prove an interference with "a business expectancy with a specific third party." *Schuler v. Abbott Laboratories*, 639 N.E.2d 144, 147 (Ill. App. 1993); see also *O'Brien v. State Street Bank & Trust Co.*, 401 N.E.2d 1356, 1358 (Ill. App. 1980); *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 720-22 (Ill. App. 1978); *Parkway Bank & Trust*

*Co. v. City of Darien*, 357 N.E.2d 211, 214-15 (Ill. App. 1976). But that requirement is satisfied. The plaintiffs' business expectancy was the expectancy of receiving liens from their owner, the County, at auctions uncontaminated by fraud by competing bidders. The County was the third party to the competition for tax liens between the plaintiffs (and the other one-armed bidders) and the defendants.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion. As this is the second reversal of the district judge in the same case, we think it best to spread the pain and invoke our Rule 36, so that the trial will be before a different judge.

REVERSED AND REMANDED.